ERIN E. SCHNEIDER (Cal. Bar No. 216114)
MONIQUE C. WINKLER (Cal. Bar No. 213031)
BERNARD B. SMYTH (Cal. Bar No. 217741)
  SmythB@sec.gov
BRIAN KNIGHT (Fla. Bar No. 0993662)
  KnightB@sec.gov
JASON H. LEE (Cal. Bar No. 253140)
  LeeJH@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, CA 94104
Telephone: (415) 705-2500
Facsimile: (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. C- |
| Plaintiff, | |
| v. | **COMPLAINT** |
| WILLIAM ALFRED BATCHELOR and JOHN MICHAEL ZUKOSKI, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "Commission") alleges:

**SUMMARY**

1. This matter involves misrepresentations and omissions in connection with the sale of $25.54 million in municipal bonds offered by the California Statewide Communities Development Authority (the "Authority") in May 2015. The Authority acted as the issuer for revenue bonds, the proceeds of which were used to fund the purchase and renovation of a building to house two public charter schools operated by Tri-Valley Learning Corporation ("Tri-Valley"). The charter schools were to share space in that building with a private high school operated by a company called California Preparatory Academies ("Cal Prep").

2.     William Batchelor was both the CEO of Tri-Valley and the founder and manager of Cal Prep, and the purchase of the building benefitted not only Tri-Valley, but Batchelor's private school as well. Debt service on the bonds was to be paid through lease payments from Tri-Valley and Cal Prep for their use of the building. However, Tri-Valley's financial ability to make lease payments was the primary factor relied upon by the underwriter and investors concerning the ability to repay the debt because they were aware that Batchelor's private high school was not yet operating at the time the bonds were sold. In fact, unbeknownst to investors and as discussed below, Tri-Valley was in such dire financial condition at the time of the offering that it was not able to make even a single lease payment under the arrangement.

3.     The Limited Offering Memorandum ("LOM") sent to potential investors in the bond offering failed to disclose that Tri-Valley was in serious financial distress at the time the bonds were sold. The LOM also contained misleading financial projections. Batchelor, as CEO of Tri-Valley, and John Zukoski, the Director of Finance for Tri-Valley, helped prepare the LOM, signed the offering document, and also signed separate certifications to the underwriter that the information in the LOM contained no material misrepresentations or omissions.

4.     However, Batchelor and Zukoski were aware of a number of issues concerning Tri-Valley's true financial state in the then-current fiscal year that were not disclosed in the LOM, including that: (1) Tri-Valley was suffering from severe cash flow problems that resulted in hundreds of thousands of dollars in delinquent debts owed to vendors; (2) Tri-Valley had taken out a private high interest term loan that was delinquent by nearly one year; (3) Tri-Valley had opened a new line of credit that had been drawn to its limit two months prior to the bond sale; and (4) Tri-Valley had received millions of dollars from one of Batchelor's non-profit companies in order to make payroll and for other operational expenses. In addition, the LOM contained a table showing financial projections for fiscal years 2015 through 2018 that was materially inaccurate. There were less than two months left in the 2015 fiscal year when the bonds were sold and it was already clear at the time of the offering that actual expenses would materially exceed the projections in the LOM.

5.     After the bonds were sold, Tri-Valley was unable to make any of the lease payments for debt service due to its continuing financial struggles. Instead, payments were made solely by Cal

Prep from funds Batchelor had raised from foreign sources.  Tri-Valley's condition continued to deteriorate, which, combined with a declining enrollment, ultimately led to it filing bankruptcy proceedings in November 2016.  The bonds subsequently defaulted in 2017.

6. As a result of the conduct described above, Batchelor, and Zukoski each violated Section 17(a)(3) of the Securities Act of 1933 ("Securities Act").

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)].

8. Venue in this District is proper pursuant to Section 22 of the Securities Act [15 U.S.C. § 77v(a)], because a substantial part of the acts and transactions constituting the violations alleged in this Complaint occurred within Alameda County, California.

## INTRADISTRICT ASSIGNMENT

9. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco or Oakland Division, because a substantial part of the events which give rise to the claims alleged herein occurred in Alameda County.

## DEFENDANTS

10. <u>William Alfred Batchelor</u>, age 45, is a resident of Danville, California.  From 2008 to 2010, he served as COO of Tri-Valley.  He then became the President and CEO of Tri-Valley until August 2015.

11.  <u>John Michael Zukoski</u>, age 44, is a resident of Pleasanton, California.  From November 2013 to August 2015, he was the Director of Finance at Tri-Valley.  Between August 2015 and March 2016, he served as interim CEO of Tri-Valley, and then took on the role of Director of Finance again for a few weeks in April 2016.

## RELEVANT ENTITIES

12. <u>Tri-Valley Learning Corporation</u> was a California nonprofit public benefit corporation based in Livermore, California, that operated charter schools from April 2004 to November 2016. Tri-Valley filed Chapter 11 bankruptcy proceedings in November 2016, subsequently converted the proceedings to Chapter 7, and all of its assets have now been liquidated.

13. <u>Independence Support, LLC</u> ("Independence Support") was a California limited liability company. Its sole member was Livermore Charter Zone Corporation, a nonprofit public benefit corporation organized in California and an organization covered by Section 501(c)(3) of the Internal Revenue Code. The proceeds of the May 2015 offering were loaned to Independence Support.

14. <u>California Preparatory Academies</u> was a California nonprofit public benefit corporation formed in January 2015. Batchelor was the registered agent for Cal Prep when it was formed. Cal Prep operated a private high school called San Francisco Bay Preparatory Academy ("SFBPA").

15. <u>California Statewide Communities Development Authority</u> is a joint powers agency organized pursuant to a Joint Powers Agreement among a number of California counties, cities and special districts. The Authority is authorized to act as the issuer in financings for the benefit of 501(c)(3) organizations such as Independence Support.

**FACTUAL ALLEGATIONS**

**A. The Schools**

16. In May 2015 the Authority acted as the issuer for the sale of $25.54 million in revenue bonds (the "2015 Bonds"). At the time the bonds were sold, Tri-Valley operated two charter schools in Livermore, California (the "Livermore schools"), two charter schools in Stockton, California (the "Stockton schools") and a charter school in San Diego, California (the "San Diego school"). The two Livermore schools were at capacity and had waiting lists of students wishing to enroll. In an effort to satisfy this demand, while at the same time providing a new state-of-the-art campus, Tri-Valley decided to facilitate the purchase of an adjacent building in Livermore that would be reconfigured and renovated as new classroom space. Tri-Valley did not have the funds to accomplish this purchase and renovation so Batchelor, Tri-Valley's CEO at the time, and Tri-Valley's board of directors determined a bond sale was necessary to obtain the required financing.

17. Batchelor also founded and was the CEO of Cal Prep, which was an entity that planned to operate a private high school called San Francisco Bay Preparatory Academy in a portion of the new building. SFBPA was not a charter school and would not have been able to sell bonds on

its own to finance a new building without Tri-Valley's participation. Thus, Batchelor's non-profit school would benefit from Tri-Valley's status as a public charter school and its ability to sell bonds. Although SFBPA was not scheduled to open until the fall of 2015, Batchelor had already raised in excess of $2 million from foreign sources for that purpose in the months before the bonds were sold.

**B. The 2015 Bond Sale**

18. Tri-Valley had already borrowed $27.5 million in a previous bond issue in 2012 (the "2012 Bonds") and could not directly take on any new debt in 2015 due to limitations on additional indebtedness in covenants related to the 2012 Bonds. As a result, Tri-Valley and the underwriter devised a structure in which they formed a new entity called Independence Support LLC that would be the actual borrower for the 2015 Bonds.

19. Independence Support was not a 501(c)(3) organization so, in order to keep the bonds tax exempt for investors, Batchelor made a related non-profit entity, the Livermore Charter Zone Corporation ("LCZC"), the sole member of Independence Support and installed Zukoski as LCZC's President. LCZC previously had been an entity that provided before and after school care to Tri-Valley students. Another newly-formed entity was also set up to purchase the building and land, and then to sell the building to Independence Support. This structure resulted in Tri-Valley itself having no actual ownership interest in the building or land. Instead, Tri-Valley and Cal Prep would be tenants in the new building and make lease payments to Independence Support that would, in turn, be used to make debt service payments on the 2015 Bonds.

20. The underwriter for the bonds distributed the Preliminary Limited Offering Memorandum ("PLOM") to potential investors on April 9, 2015. A total of six institutional investors committed to purchasing the entire $25.54 million bond issue after receiving the PLOM and performing their own due diligence. The closing of the bond sale occurred on May 8, 2015, at which time the final LOM was signed and given to investors. Batchelor signed the LOM on behalf of Tri-Valley as its President, and Zukoski signed the LOM for Independence Support. In connection with the closing, Batchelor also signed a certification to the underwriter on behalf of Tri-Valley stating that there were no material misrepresentations or omissions in the LOM. Zukoski signed the bond

purchase agreement with the underwriter on behalf of Independence Support, also certifying that there were no material misrepresentations or omissions in the LOM.

### C. Material Misrepresentations and Omissions in the LOM

21.     Because Tri-Valley was the expected source of the lease payments that would be used to repay the bonds, the LOM for the 2015 Bonds contained information about Tri-Valley's financial condition.  As discussed below, however, the LOM contained material misrepresentations and omissions concerning Tri-Valley's true financial state at the time the bonds were sold.  In particular, the LOM failed to disclose that Tri-Valley was concurrently experiencing severe cash flow issues impacting its ability to make the lease payments that would pay debt service on the bonds.

#### 1. Tri-Valley Failed to Disclose Significant Cash Flow Issues in FY 2015

22.     During FY 2015, Tri-Valley had serious cash flow problems that caused a variety of operational difficulties.  For example, Tri-Valley was delinquent on hundreds of thousands of dollars in payments to a number of vendors and was also delinquent in paying property taxes.  Zukoski was the main Tri-Valley contact with the vendors and he was repeatedly forced to delay payments under the original payment terms and, even then, Tri-Valley was generally unable to comply with new payment plans agreed on by the vendors.  In asking one vendor for additional deferrals in September 2014, Zukoski stated in an email: "we're still scraping by at this point and to be blunt it's going to be tough for us to make payroll."  Another vendor was told in January 2015 that Tri-Valley was in a "cash crunch" and could not make an already-deferred payment at that time.  Still another vendor denied the Stockton schools access to an important online learning tool just prior to the bond sale because it was owed more than $200,000 that was at least six months overdue.

23.     There were two main causes of the cash flow issues.  First, the 2012 Bonds had a feature in which debt service payments were intercepted directly out of school funding payments from the State of California so Tri-Valley never received its full state funding allotment.  Second, the state at that time was delaying making its funding payments to all charter schools so Tri-Valley was months behind on the receipt of needed cash.

24.     As a result of these problems, Tri-Valley required infusions of cash from external sources to keep its schools open. In FY 2015, Batchelor's companies, Cal Prep and SFBPA,

transferred more than $2 million to Tri-Valley. Additionally, on at least two occasions in late 2014, Tri-Valley was unable to make payroll and had to rely on large short-term loans from a friend of Batchelor's to pay its employees.

25. These difficulties were not disclosed in the LOM and their omission rendered the following statements in the LOM materially misleading and incomplete:

- "While the obligation to pay Rent is a joint obligation of the Tenants that is expected to be derived from revenues of both [Tri-Valley] (from the Charter Schools) and [Cal Prep] (from the Private School), the Private School has no operating history, and management of [Tri-Valley] anticipates that Tri-Valley Gross Revenues will be sufficient to provide for the payment of all Rent owed under the Lease."
- "Security and Sources of Repayment. … Under the Lease, the Tenants are required to make payments of Rent (including Base Rent, Additional Rent and expenses) to the Borrower for use of the Facilities. Amounts payable by the Tenants pursuant to the Lease are anticipated to be the Borrower's sole source of revenue to repay its obligations under the Loan Agreement."
- "Under the Loan Agreement, the Authority will loan the proceeds of the Bonds to the Borrower. In the Loan Agreement, the Borrower will covenant to repay the funds borrowed from the Authority, together with interest thereon, in installments which will be sufficient to pay, when due, the principal of, premium, if any, and interest on the Bonds."

26. The assertion that management of Tri-Valley anticipated that its gross revenues would be sufficient to provide for all payment of the Rents (and therefore, the interest and principal payments owed to investors), was materially misleading in light of the omitted negative information about Tri-Valley's cash flow problems. Without the omitted information about Tri-Valley's cash flow crisis, investors could not understand that there was, in fact, significant risk that Tri-Valley's gross revenues would be insufficient to meet debt service obligations.

27. Similarly, the statement that the Tenants' rent payments would be the sole source of revenue for bond repayment was materially misleading because it suggested that Tri-Valley was in a

position to make those payments. The omitted information about Tri-Valley's then-known cash flow crisis was necessary for investors to understand that there was significant risk that the Tenants would likely not be in a position to make all or many of those payments. Indeed, Tri-Valley ultimately could not make a single debt service payment after the 2015 Bonds were sold.

28. Lastly, the statement that the Borrower would covenant to repay the funds borrowed was materially misleading in light of the fact that, as a result of Tri-Valley's cash flow crisis, Batchelor and Zukoski knew or should have known at the time of the offering that the Borrower would be unable to comply with the covenant.

**2. Tri-Valley Failed to Disclose New Material Debt**

29. Tri-Valley had a private loan and a line of credit in FY 2015 that were material but were not disclosed to investors in the LOM. In February 2014, Batchelor obtained a $600,000 private loan for Tri-Valley at a 13.75% interest rate from a friend of Batchelor's to help fund the Stockton schools. The loan was supposed to be repaid in 90 days but Tri-Valley was unable to make the payments at the end of that term. Once the loan was in default, Batchelor had Cal Prep pay some of the interest at the default rate of 15%, but all of the principal was still outstanding a year later when the 2015 Bonds were sold. Tri-Valley finally paid off the loan in July and August 2015.

30. In addition to the undisclosed private loan, in September 2014 Tri-Valley secured a new one-year line of credit in the amount of $675,000 from a local bank with which Tri-Valley had not previously done business. Zukoski tapped the line of credit over the course of the year, mostly to cover overdrawn bank accounts of the various schools operated by Tri-Valley. The line was eventually drawn to its limit in March 2015, just two months prior to the sale of the 2015 Bonds. Tri-Valley was unable to pay off the line and had to renew it as a term loan in September 2015. The new line of credit and the fact that it had been recently drawn to its limit were not disclosed in the LOM.

31. As with the omission of the cash flow issues, the omission of this negative information rendered misleading the LOM's statements (discussed above) relating to Tri-Valley being the expected source of repayment for the bonds. Tri-Valley's undisclosed indebtedness directly affected its creditworthiness and the likelihood that it would be in a position to make the rent payments that would, in turn, fund the interest and principal payments owed to investors. Without disclosure of the

indebtedness, investors were unable to appreciate the true risks associated with whether they would be repaid.

### 3. Financial Projections for FY 2015 Were Materially Inaccurate

32. The LOM for the 2015 Bonds contained a table with projections for FY 2015 through FY 2018 that were materially misleading. This projection was the only place in the LOM that had any type of financial information for the current, nearly completed fiscal year 2015. At the time the bonds were sold there were less than two months left in FY 2015, and Zukoski and Batchelor knew or should have known that expenses at that time already equaled or exceeded what was projected for that entire year.

33. About a week before the bond transaction closed, Tri-Valley posted on EMMA an unaudited nine-month balance sheet and income statement for FY 2015, which was part of its continuing disclosure for the 2012 Bonds (EMMA is the electronic system that acts as a repository for continuing disclosure made by issuers of municipal bonds). This document showed Tri-Valley's expenses for that nine-month period were already nearly the same as the full-year expenses projected in the LOM. Zukoski had prepared the projections that were included in the LOM in February 2015 and made no adjustment to those numbers between that time and the time of the bond offering in May 2015.

34. The underwriter for the 2015 Bonds and investors had already concluded their due diligence and committed to purchasing the bonds at the time of the EMMA posting. Neither Batchelor nor Zukoski alerted the underwriter that new financial information had been posted, and the banker at the underwriter who worked on the bond offering was not aware of the posting before the transaction closed.

### D.  Tri-Valley Filed Bankruptcy Proceedings and Defaulted on the 2015 Bonds

35. Batchelor stepped down from his role at Tri-Valley in August 2015, in part to avoid the appearance of a conflict of interest between Tri-Valley and his private entities, and Zukoski was then appointed as interim CEO. Tri-Valley's financial problems continued after the 2015 Bonds were sold. It was unable to make any of the monthly lease payments that were to be used to pay back

investors. Instead, Batchelor made all of the necessary payments out of SFBPA's bank account using funds he had raised from foreign sources.

36. After Tri-Valley missed payroll in April 2016, the Tri-Valley board asked Zukoski to resign and a new CEO was appointed. The new CEO quickly discovered that Tri-Valley's problems were far worse than anticipated. By November 2016, Tri-Valley filed Chapter 11 bankruptcy proceedings. The 2015 Bonds defaulted in March 2017 and Tri-Valley's assets were subsequently liquidated.

**CLAIM FOR RELIEF**

*Violations of Section 17(a)(3) of the Securities Act*

*(Against All Defendants)*

37. Paragraphs 1 through 36 are hereby re-alleged and are incorporated herein by reference.

38. By reason of the foregoing, Batchelor and Zukoski directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers.

39. By reason of the foregoing, Batchelor and Zukoski directly or indirectly, violated and unless enjoined will continue to violate, Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

**I.**

Finding that Defendants violated Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

**II.**

Permanently restraining and enjoining Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual

notice of the injunction by personal service or otherwise, from directly or indirectly violating Section 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(3)].

### III.

Permanently restraining and enjoining Defendants from participating in any offering of municipal securities, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any municipal security; *provided however*, that such injunction shall not prevent Defendants from purchasing or selling municipal securities for their own personal accounts.

### IV.

Ordering Defendants to pay civil penalties pursuant to Section 20(d)(1) of the Securities Act [15 U.S.C. § 78t(d)(1)].

### V.

Granting such other relief as this Court may deem just and appropriate.

Dated: April 27, 2020                                                         Respectfully submitted,

_____
Brian P. Knight
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION